IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | <u>S E C O N D   S U P E R S E D I N G</u> <u>I N D I C T M E N T</u> |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| JOSE BERNARDO LOZANO-LEON, | ) | |
| MARIO KARIM HERNANDEZ-LEON, | ) | |
| CLEMENTE GUTIERREZ-MERAZ, | ) | CASE NO.: <u>1:19-CR-523</u> |
| LORNE FRANKLIN, | ) | Title 21, United States Code, |
| LEEVERN COLEMAN, | ) | Sections 841(a)(1), (b)(1)(A), |
| BELEN OROZCO-SIGALA, | ) | (b)(1)(B), (b)(1)(C), 843(b), |
| NAJEE AMIR EVANS, | ) | and 846; Title 18, United States |
| TROY PINNOCK, | ) | Code, Sections 1956(h) and 2 |
| DAMON BYBEE, | ) | |
| MONTEZ VANBUREN, | ) | |
| MARK CARTER, | ) | |
| LUCIA ISELA ARGUELLES, | ) | |
| OSCAR FABIAN GARCIA-REYES, | ) | |
| JOSE FRANCISCO REYES, | ) | |
| | ) | |
| Defendants. | ) | |

<u>GENERAL ALLEGATIONS</u>

At all times relevant to this Second Superseding Indictment, unless otherwise specified:

1.       Before Defendant JOSE BERNARDO LOZANO-LEON ("LOZANO")

committed the offenses charged in this Second Superseding Indictment, LOZANO had a final

conviction for a serious drug felony, namely, a conviction under Title 21, United States Code,

Sections 846 and 841(a)(1) and (b)(1)(A), to wit:  a conviction for Conspiracy to Possess with

Intent to Distribute and to Distribute 1 Kilogram of Heroin, in Case No. 1:08-CR-326 in the U.S.

District Court for the Northern District of Ohio, on or about November 18, 2008, for which

LOZANO served more than 12 months of imprisonment and for which LOZANO was released from serving any term of imprisonment related to that offense within 15 years of the commencement of each of the instant offenses charged in this Second Superseding Indictment.

2.      Before Defendant LORNE FRANKLIN committed the offenses charged in this Second Superseding Indictment, FRANKLIN had a final conviction for a serious drug felony, namely, a conviction under Ohio Revised Code Section 2925.03, to wit:  a conviction for Trafficking Offenses (F1), in Case No. CR-10-539188-A in the Cuyahoga County Court of Common Pleas, on or about April 7, 2011, for which FRANKLIN served more than 12 months of imprisonment and for which FRANKLIN was released from serving any term of imprisonment related to that offense within 15 years of the commencement of each of the instant offenses charged in this Second Superseding Indictment.

COUNT 1
(Conspiracy to Distribute Controlled Substances, 21 U.S.C. § 846)

The Grand Jury charges:

3.      The allegations contained in paragraphs 1 and 2 of this Second Superseding Indictment are incorporated by reference as if stated fully herein.

4.      From in or around October 2018, to on or about September 12, 2019, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants JOSE BERNARDO LOZANO-LEON ("LOZANO"), MARIO KARIM HERNANDEZ-LEON ("HERNANDEZ"), CLEMENTE GUTIERREZ-MERAZ ("GUTIERREZ"), LORNE FRANKLIN, LEEVERN COLEMAN, BELEN OROZCO-SIGALA ("OROZCO"), NAJEE AMIR EVANS, TROY PINNOCK, DAMON BYBEE, MONTEZ VANBUREN, MARK CARTER, LUCIA ISELA ARGUELLES, OSCAR FABIAN GARCIA-REYES ("GARCIA"), and JOSE FRANCISCO REYES did knowingly and intentionally

2

combine, conspire, confederate, and agree together and with each other and with others known

and unknown to the Grand Jury, to possess with intent to distribute and to distribute controlled

substances, including the following quantities of the following controlled substances, in violation

of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C), and

(b)(1)(D):

a.     400 grams or more of a mixture and substance containing a detectable

amount of fentanyl, a Schedule II controlled substance;

b.     100 grams or more of a mixture and substance containing a detectable

amount of one or more fentanyl analogues, that is:  carfentanil, a Schedule I controlled

substance; and butyrylfentanyl, a Schedule I controlled substance;

c.     100 grams or more of a mixture and substance containing a detectable

amount of heroin, a Schedule I controlled substance;

d.     50 grams or more of methamphetamine, a Schedule II controlled

substance;

e.     500 grams or more of cocaine, a Schedule II controlled substance;

f.     a detectable amount of 4-ANPP, a Schedule II controlled substance; and

g.     a detectable amount of marijuana, a Schedule I controlled substance.

MANNER AND MEANS OF THE CONSPIRACY

5.     It was part of the conspiracy that:

a.     LOZANO, while incarcerated at the Northeast Ohio Correctional Center

("NEOCC") in Youngstown, Ohio from in or around November 2018 through the present,

obtained and used a smuggled, contraband cellular telephone to communicate with co-

conspirators and manage the LOZANO Drug Trafficking Organization (the "DTO").

b.      LOZANO spoke frequently with co-conspirators to arrange shipments of various drugs from Mexico and other source locations to Cleveland, Ohio and elsewhere, for distribution in Northeast Ohio.  The DTO specialized in pharmaceutical tablets or pills that appeared to be prescription oxycodone, but actually contained other controlled substances, primarily fentanyl and fentanyl analogues.

c.      HERNDANDEZ obtained drugs for the DTO in Mexico and arranged for those drugs to be smuggled into the United States and then sent to co-conspirators in Northeast Ohio.

d.      HERNANDEZ often traveled between the areas of Tijuana, Mexico, and San Diego, California, and arranged to receive drug proceeds in California and take the money to make payments to sources of supply in Mexico.

e.      GUTIERREZ, operating from Mexico, arranged for distribution quantities of drugs to be smuggled into the United States and transferred to co-conspirators in Northeast Ohio and elsewhere, and to transfer drugs that had previously been smuggled into the United States throughout the country.

f.      GARCIA coordinated the movement and transfer of drugs and money for GUTIERREZ, primarily operating between Illinois and Ohio.

g.      REYES coordinated sales of drugs for GUTIERREZ.

h.      ARGUELLES arranged to receive drugs in Arizona after they had crossed the border and sell them or to transport them to customers in other areas of the county.

i.      FRANKLIN received shipments of drugs arranged by LOZANO and sold the drugs in the Cleveland, Ohio, area.

j.      FRANKLIN arranged for cash drug proceeds to be sent to sources of supply or their designees in Mexico, Arizona, and California by various means, including wire transfers, bank deposits, and sending bulk cash through the U.S. mail.

k.      COLEMAN, while incarcerated at NEOCC and in federal prison in Michigan, helped LOZANO communicate with and direct the actions of co-conspirators, including FRANKLIN, COLEMAN's son.

l.      CARTER, while incarcerated at NEOCC, obtained and used a smuggled, contraband cellular telephone to communicate with co-conspirators, including LOZANO. CARTER arranged through COLEMAN and LOZANO to send shipments of drugs to his associates on the east coast of the United States, and pay LOZANO's designees for the shipments.

m.      OROZCO arranged for cash drug proceeds to be sent to sources of supply or their designees in Mexico, Arizona, and California by various means, including wire transfers. OROZCO also made payments on behalf of LOZANO and the DTO by other means, including through digital payment services providers, such as "Cash App," a mobile device-based application through which individuals can send money from person to person.

n.      EVANS obtained distribution quantities of purported heroin from FRANKLIN for redistribution in Northeast Ohio.

o.      PINNOCK provided FRANKLIN with drugs for resale.

p.      VANBUREN and BYBEE assisted FRANKLIN with the DTO's drug distribution activities, including by serving as money couriers transferring payments of cash drug proceeds to pay for drug shipments.

q.      Co-conspirators used multiple telephones to conduct drug trafficking activity by making and receiving telephone calls and sending and receiving text messages and mobile messaging applications such as "WhatsApp."  When using cellular telephones and messaging to conduct drug trafficking activity, co-conspirators often used slang terms, street terminology, and code words and phrases for controlled substances to obscure and disguise the true nature of their activities and the true meaning of their conversations.

<u>ACTS IN FURTHERANCE OF THE CONSPIRACY</u>

6.      In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed acts in the Northern District of Ohio, Eastern Division, and elsewhere, including, but not limited to, the following:

7.      In or around January 2019, LOZANO, while incarcerated at NEOCC, caused to be sent to a DEA Confidential Source (the "CS") a parcel ("Marijuana Parcel 1") containing four individually wrapped packages of marijuana, totaling approximately 1,783.5 grams, concealed inside of a white plastic bucket.

8.      On or about January 9, 2019, LOZANO called the CS on the telephone.  During the conversation, LOZANO indicated that a parcel containing approximately four pounds of marijuana was being sent to an address in Cleveland, Ohio.  LOZANO directed the CS to sell the marijuana for $1,600 per pound.  LOZANO further directed the CS to give $1,200 in proceeds of the sale of the marijuana to OROZCO.

9.      In or around January 2019, LOZANO caused to be sent to the CS a parcel ("Marijuana Parcel 2") containing 10 individually sealed clear plastic bags of marijuana, totaling approximately 4,641.4 grams, concealed inside of a white plastic bucket.

10.      On or about January 24, 2019, LOZANO called the CS on the telephone.  During the conversation, LOZANO informed the CS of Marijuana Parcel 2 by stating that a package had

6

been delivered to a particular address.  Marijuana Parcel 2, a large cardboard box, was in fact on the front porch at that address.

11.    On or about March 21, 2019, LOZANO and the CS had a conversation in a series of telephone calls and text messages, with LOZANO using a contraband cellular telephone while incarcerated at the NEOCC.  During the conversation, the CS sought to arrange to purchase two pounds of marijuana.  LOZANO indicated that several types of marijuana were available for sale.  In a text messages, LOZANO identified the types of marijuana available as, "gorila-glu yak-de-riper girl-scaut-cuki ouyi-kem guF5."  LOZANO stated that the price per pound of marijuana was $1,700.

12.    On or about March 23, 2019, LOZANO sent the CS text messages directing the CS to send money to Sacramento, California, via a Walmart-to-Walmart money transfer, to pay for the marijuana to be sent to the CS.

13.    On or about March 24, 2019, at approximately 6:55 p.m., LOZANO and the CS had a text message conversation.  During the conversation, LOZANO directed the CS to send $1,500 to Person 1 in Sacramento, California.  The CS indicated that the CS only had $500 available to send.  LOZANO then stated, "CAN U SCRATCH 700 [pull together $700].? ILLHAVE MY GIRL [OROZCO] DO 700 ON MY SIDE."  The CS said the CS hoped the marijuana was of good quality.  LOZANO replied, "THIS THE REAL DEAL..I GOT SOME WAX [substance containing the active ingredient in marijuana] HERE ALSO..AND DA SKITTLES [fentanyl pills] B HERE TOMORROW."  The CS asked who was getting the "Skittles."  LOZANO replied that his "people" were traveling to the Bronx, New York, to pick up 4,000 pills and transport them back to northeast Ohio.

14.     On or about March 25, 2019, at approximately 5:25 p.m., at LOZANO's direction, the CS sent $500 to Person 1 in Sacramento, California.

15.     On or about March 26, 2019, beginning at approximately 8:00 a.m., the CS called LOZANO on the telephone.  During the conversation, the CS asked LOZANO if the source of supply shipped the marijuana.  LOZANO stated that he was working on sending another $800 to the source of supply, and that OROZCO had sent $750 the previous day.  LOZANO directed the CS to meet with OROZCO at her residence in Painesville Township, Ohio, and said that OROZCO would provide the CS with U.S. currency that the CS should send to the source of supply in Sacramento, California, via Walmart-to-Walmart money transfer.

16.     On or about March 26, 2019, at approximately 6:27 p.m., OROZCO met with the CS and provided the CS $300 of U.S. currency.

17.     On or about March 26, 2019, at approximately 6:59 p.m., OROZCO traveled to an ATM machine at Chase Bank in Mentor, Ohio, withdrew U.S. currency, and then drove to meet the CS in the parking lot of the Walmart Store in Mentor, Ohio.  OROZCO handed the CS an additional $400 in U.S. currency and departed the area.

18.     On or about March 26, 2019, at approximately 7:08 p.m., at LOZANO's direction, the CS sent $700 to the source of supply in California via Walmart-to-Walmart money transfer to Person 2.

19.     In or around March 2019, LOZANO caused to be sent to the CS in Cleveland, Ohio, a parcel containing a plastic container concealing approximately 958 grams of marijuana ("Marijuana Parcel 3").

20.     On or about March 30, 2019, at approximately 9:52 p.m., LOZANO sent a text message to the CS that contained a U.S. Postal Service ("USPS") tracking number for Marijuana Parcel 3.

21.     On April 1, 2019, LOZANO called the CS on the telephone.  During the conversation, LOZANO indicated that an additional parcel containing approximately five pounds of marijuana was being shipped to the CS.  LOZANO estimated that the parcel would arrive on April 3, 2019.  LOZANO further stated that he was in the process of making contact with his brother, HERNANDEZ, to discuss a future plan to import heroin and fentanyl pills into the United States from Mexico.  LOZANO stated that if he is able to secure the drugs, he would need the CS to travel to California and mail the drugs back to Cleveland, Ohio.

22.     In or around April 2019, LOZANO caused to be sent to the CS in Cleveland, Ohio, a parcel containing a plastic bucket that contained five individually wrapped one-pound-sized packages of marijuana, totaling approximately 2,397 grams of marijuana ("Marijuana Parcel 4").

23.     On or about April 3, 2019, at approximately 5:11 p.m., LOZANO called the CS on the telephone.  During the conversation, LOZANO directed the CS to send payment for the marijuana in Marijuana Parcels 3 and 4 to two individuals in California.  LOZANO stated that the CS should send $1,500 to one individual and $1,000 the other.  LOZANO then requested that the CS provide the remaining $200 to OROZCO.

24.     On or about April 3, 2019, at LOZANO's direction, OROZCO and the CS met at OROZCO's residence in Painesville, Ohio, and the CS delivered OROZCO $200 in purported proceeds from the sale of marijuana in Marijuana Parcels 3 and 4.

9

25.     On or about April 4, 2019, at approximately 11:54 a.m., LOZANO and the CS had a text message conversation.  During the conversation, LOZANO provided the CS with FRANKLIN's cellular telephone number.  LOZANO said that the CS needed to deliver the marijuana from Marijuana Parcel 4 to and individual named "LO [LORNE FRANKLIN]."

26.     On or about April 4, 2019, at approximately 3:51 p.m., the CS and FRANKLIN had a text message conversation.  During the conversation, FRANKLIN agreed to meet the CS on the west side of Cleveland after 7:00 p.m.

27.     On or about April 4, 2019, at approximately 7:42 p.m., FRANKLIN called the CS on the telephone.  During the conversation, FRANKLIN stated that he would be arriving shortly to the agreed meeting place, the parking lot of the TGI Friday's restaurant in Brooklyn, Ohio, and that he was in a red Nissan Maxima.

28.     On or about April 4, 2019, at approximately 8:03 p.m., FRANKLIN and Person 13 arrived to the TGI Friday's parking lot in a red Nissan Maxima, with Person 13 driving, and parked next to the CS's vehicle.  The CS then placed the bag containing the marijuana from Marijuana Parcel 4 into the trunk of the Maxima.  FRANKLIN and Person 13 then departed the area in the Maxima, and the Ohio State Highway Patrol soon stopped the vehicle and seized the marijuana.

29.     On or about April 9, 2019, at approximately 4:11 p.m., LOZANO called FRANKLIN on the telephone.  During the conversation, they discussed FRANKLIN's efforts to collect money from various co-conspirators who were selling drugs LOZANO obtained for FRANKLIN to distribute.  LOZANO explained the need to collect $27,500 to give to a source of supply and stated, "So we need to get 950 from [Person 18, a female drug trafficker] and then the 11 from Philly [a nickname for CARTER] and then from you I think it's 14,250 [collect $950

10

from Person 18, $11,000 from CARTER, and $14,500 from FRANKLIN]. Ok?" LOZANO said

that "makes it 26,900," and he would provide the remaining $600. LOZANO then explained

plans to obtain "5-600 pounds of Reggie [marijuana]" through his brother HERNANDEZ, and to

obtain kilogram quantities of "soft [powder cocaine]," which "in San Diego" were "going for 25

[$25,000 for a kilogram of cocaine]." LOZANO also instructed FRANKLIN to make contact

with CARTER. FRANKLIN said CARTER was not answering his phone, and LOZANO said,

"I think your dad [COLEMAN] talked to him," and asked FRANKLIN to provide CARTER's

number.

30.     On or about April 9, 2019, at approximately 9:15 p.m., LOZANO had a telephone

conversation with OROZCO. During the conversation, LOZANO shared details of a recent

conversation he had with HERNANDEZ. LOZANO explained that if LOZANO got things lined

up, HERNANDEZ's boss would gift them 100 kilograms of marijuana to get them started.

LOZANO said that his people can sell 100 pounds of marijuana every two weeks. LOZANO

stated that if he charged an extra $50 per pound, he would make an extra $5,000. LOZANO

explained that he and OROZCO could purchase a vehicle within a month's time and "have the

money work for" them.

31.     On or about April 10, 2019, at approximately 4:20 p.m., LOZANO and

COLEMAN had a text message conversation while COLEMAN was incarcerated at a federal

prison in Michigan and LOZANO was still incarcerated at NEOCC. During the conversation,

LOZANO sent the following message to COLEMAN: "WHATS UP BROTHER.. WE NEED

TO SEE PHILLY [CARTER] TOMORROW. HAVE HIM BRING THE CONTRACTS

[money] AND MATERIALS [drugs] SO WE CAN FINISH THE JOB AND MOVE TO THE

NEXT ONE. THEY HOLDING US BACK. YOUR SON [FRANKLIN] SAID HE CAN GO UP THERE TO SEE HIM."

32.     On or about April 10, 2019, starting at approximately 7:44 p.m., LOZANO and OROZCO had a conversation in a series of telephone calls and text messages.  During the conversation, LOZANO directed OROZCO to send $900 to an individual in Mexico, to secure the delivery of a shipment of drugs.  Later in the conversation, LOZANO directed OROZCO to send the money to Person 2 in Colima, Mexico.  LOZANO asked OROZCO to send the money order confirmation number to "Ceb[o]llo [GUTIERREZ's nickname], to Clemente [GUTIERREZ]."

33.     On or about April 10, 2019, at LOZANO's direction, OROZCO wired $890 to GUTIERREZ's designee through the money-transfer service Elektra.

34.     On or about April 10, 2019, at approximately 8:46 p.m., LOZANO and FRANKLIN had a text message conversation.  During the conversation, LOZANO stated, "BRO THEY ASKING ME ABOUT THE 5 [pounds of marijuana] THAT GOT LOST [seized by law enforcement from the trunk of the red Nissan Maxima].. THEY WANT TO COME IN FRIDAY FOR THOSE 7 STACKS [$7,000]."  FRANKLIN responded, "I can get them half [$3,500]."

35.     On or about April 11, 2019, at approximately 12:24 a.m., GUTIERREZ and LOZANO had a text message conversation.  During the conversation, GUTIERREZ stated, "Cousin, tomorrow at noon the pills [fentanyl pills] will arrive.  To the address you gave me." LOZANO replied, "Okay maybe in the afternoon I already have everything [money] gathered and just need few more pesos [money] to be all set."  GUTIERREZ said the money should be ready by the following afternoon and explained that he had already told his own source of the supply the money was coming.

36.     On or about April 11, 2019, at approximately 12:29 a.m., LOZANO sent a text message to FRANKLIN that stated, "TOMORROW DA SKITTLES [fentanyl pills] ARRIVE AT 33** [an address in in Cleveland, Ohio associated with FRANKLIN] AROUND NOON.. KEEP AN EYE OUT. WE GOTTA GET PAPER [money] ASAP SO WE CAN PAY EVERYBODY UP."

37.     On or about April 11, 2019, at approximately 11:14 a.m., COLEMAN sent a text message to LOZANO stating that, "them papers [money] here great bra u feel me I got Philly [CARTER] ok [COLEMAN made contact with CARTER and made arrangements for money to be delivered to Cleveland, Ohio]."

38.     On or about April 11, 2019, at approximately 11:17 a.m., GUTIERREZ and LOZANO had a text message conversation.  During the conversation, GUTIERREZ sent a message with the USPS tracking number associated with a parcel that was delivered to 33** East 106th Street, Cleveland, Ohio ("Fentanyl Pill Parcel 1").  GUTIERREZ then stated, "It arrives today."  LOZANO asked, "How are the blue ones [fentanyl pills] arriving, by mail?"

39.     On or about April 11, 2019, at approximately 11:23 a.m., LOZANO sent a text message to FRANKLIN with the USPS tracking number for Fentanyl Pill Parcel 1.

40.     On or about April 11, 2019, at approximately 11:24 a.m., FRANKLIN called LOZANO on the telephone.  During the conversation, FRANKLIN stated, "They're here [Fentanyl Pill Parcel 1 has arrived].  What did he say?  I'm at the store.  My brother got them.  I just got to go pick them up.  He got them though."  Later in the conversation, LOZANO said they "need to give them 27 5 [pay $27,500 for the drugs]."  FRANKLIN asked how many pills arrived.  LOZANO said "5,000."

41.    On or about April 11, 2019, at approximately 11:34 a.m., LOZANO and
GUTIERREZ had a text message conversation.  During the conversation, LOZANO stated that
the pills arrived.  Later in the conversation, GUTIERREZ said the pills in that shipment were
"stronger."

42.    On or about April 11, 2019, at approximately 7:54 p.m., GUTIERREZ and
LOZANO had a conversation on the telephone.  During the conversation, they discussed
payment for Fentanyl Pill Parcel 1.  GUTIERREZ then handed the phone to an unidentified male
("UM") who spoke with LOZANO.  The UM explained that LOZANO urgently needed to send
$20,000 to Phoenix, Arizona for Fentanyl Pill Parcel 1, and send $7,500 to Washington state for
Marijuana Parcel 4.  They also discussed LOZANO's sending all or part of the $20,000 through
the mail.

43.    On or about April 11, 2019, at approximately 8:02 p.m., GUTIERREZ sent a text
message to LOZANO that contained the address, "**** N. Dysart Road #**, avondale, AZ
85323."

44.    On or about April 11, 2019, at approximately 8:05 p.m., LOZANO and
FRANKLIN had a conversation on the telephone.  During the conversation, LOZANO explained
that they needed to send $20,000 in the mail the following day.  LOZANO also stated that on
Saturday, they needed to send an additional $7,500 through the mail.  LOZANO also informed
FRANKLIN that the pills in Fentanyl Pill Parcel 1 were reportedly stronger.

45.    On or about April 11, 2019, at approximately 8:10 p.m., LOZANO and
FRANKLIN had a text message conversation.  During the conversation, they discussed money
that FRANKLIN was supposed to send through the mail.  LOZANO asked if FRANKLIN "had

14

everything covered [had $20,000 to send]." FRANKLIN confirmed that he did, and LOZANO sent him the following address, "[Person 3] **** N. Dysart Rd #** Avondale AZ. 85323."

46.    On or about April 12, 2019, at approximately 6:07 p.m., LOZANO had a conversation with FRANKLIN on the telephone. During the conversation, FRANKLIN indicated he was not able to make it to the post office in time to send the money.

47.    On or about April 12, 2019, at approximately 6:11 p.m., LOZANO sent a text message to FRANKLIN stating, "BOOK A FLIGHT SO U CAN TAKE IT TO THEM [money to the source of supply] TOMORROW. TO PHOENIX ARIZONA."

48.    On or about April 12, 2019, at approximately 6:15 p.m., LOZANO called GUTIERREZ on the telephone. During the conversation, LOZANO said FRANKLIN was booking a flight to deliver the $20,000 by hand.

49.    On or about April 13, 2019, at approximately 2:55 p.m., LOZANO and FRANKLIN had a conversation on the telephone. During the conversation, LOZANO directed FRANKLIN to fly to Phoenix, Arizona to deliver the money. FRANKLIN said the flights were expensive. LOZANO said, "it doesn't matter what they cost."

50.    On or about April 13, 2019, at approximately 3:18 p.m., LOZANO sent FRANKLIN a series of text messages reminding FRANKLIN of the importance of making a good impression. In one message, LOZANO stated, "THEY GOT ALL THE OTHER WORK. FIRST IMPRESSIONS R VERY IMPORTANT SO THEY CAN TRUST US AND SEND US THE WHITE N CHINESSE BI***ES [cocaine and heroin]."

51.    On or about April 13, 2019, at approximately 3:33 p.m., LOZANO and FRANKLIN had a text message conversation. During the conversation, LOZANO urged FRANKLIN to provide his flight information. FRANKLIN responded and provided LOZANO

with the flight number: "F9 [Frontier Airlines] 2414 555am." FRANKLIN indicated that only

one person was traveling to Phoenix, Arizona. LOZANO urged FRANKLIN to recruit a second

courier, and also suggested that they use the ruse that the couriers are traveling to Phoenix,

Arizona, to purchase a food truck.

52.    On or about April 13, 2019, at approximately 5:32 p.m., CARTER called

LOZANO on the telephone while both were incarcerated at NEOCC and using contraband

cellular telephones. During the conversation, they discussed how LOZANO was going to collect

money from CARTER for a fentanyl pill shipment. CARTER said LOZANO's wife, OROZCO,

could pick the money up from CARTER's wife, and explained, "She can go right to my wife's

crib [house] and chill there." CARTER said, OROZCO would "chill for a minute. My man

gonna pull up [drop off money] and that's gonna be it. You know what I'm saying?"

53.    On or about April 13, 2019, at approximately 6:53 p.m., LOZANO and

GUTIERREZ had a text message conversation. During the conversation, LOZANO forwarded

the flight information received from FRANKLIN to GUTIERREZ. Later in the conversation,

GUTIERREZ said to give his telephone number to the couriers to coordinate picking them up at

the airport.

54.    On or about April 14, 2019, at approximately 12:29 a.m., LOZANO and

FRANKLIN had a text message conversation. During the conversation, LOZANO asked

FRANKLIN how much money each of the couriers would be carrying. FRANKLIN replied, "9

[$9,000] apiece." LOZANO then said, "OK. GOOD. IF THEY NEED DA OTHER 2 [$2,000]

WE CAN WIRE IT OR WHATEVER."

55.    On or about April 14, 2019, at approximately 12:35 a.m., LOZANO sent a text

message to GUTIERREZ stating, "I sent 2 people with 9 thousand each, because if they take

16

more than 10 [$10,000] they need to declare it. If you need the other 2 [$2,000] have them give me 2 names and I will send it, ok."

56.     On April 14, 2019, at approximately 9:01 a.m., LOZANO and GUTIERREZ had a text message conversation.  During the conversation, GUTIERREZ asked if the couriers departed Cleveland, Ohio, because they had not called to be picked up at the airport in Phoenix, Arizona.

57.     On April 14, 2019, at approximately 11:33 a.m., LOZANO called FRANKLIN on the telephone.  During the conversation, FRANKLIN said one courier had an expired identification and was not permitted to board the plane, and the other courier had decided not to make the trip alone.  LOZANO directed FRANKLIN to download WhatsApp on his cellular telephone and send photographs of the plane tickets and the money to GUTIERREZ at cellular telephone number "01152********** [GUTIERREZ's Mexico-based number]."

58.     On or about April 14, 2019, at approximately 10:28 p.m., GUTIERREZ had a text message conversation with LOZANO.  During the conversation, GUTIERREZ requested that LOZANO and FRANKLIN deposit $7,000 into a Chase bank account, which was payment for 5 pounds of marijuana from Marijuana Parcel 4 delivered to FRANKLIN.  GUTIERREZ then provided LOZANO the account information:  "Chase ******132 [Person 4]."

59.     On or about April 14, 2019, at approximately 1:17 p.m., LOZANO sent a text message to FRANKLIN providing him with instructions on depositing $7,000 into Person 4's Chase bank account.

60.     On or about April 15, 2019, at approximately 4:50 a.m., LOZANO and FRANKLIN had a text message conversation.  During the conversation, FRANKLIN told LOZANO that he was on his way to drop three couriers off at the airport.

61.     On or about April 15, 2019, at approximately 5:30 a.m., BYBEE, VANBUREN, and Person 14 arrived at Cleveland-Hopkins International Airport in Cleveland, Ohio, and checked in for a flight to Phoenix, Arizona.

62.     On or about April 15, 2019, at approximately 6:12 a.m., LOZANO had a conversation with FRANKLIN on the telephone. During the conversation, FRANKLIN confirmed that he sent a total of $16,800 with the couriers to be delivered in Phoenix, Arizona. LOZANO said to send the balance via Walmart-to-Walmart money transfer.

63.     On April 15, 2019, at approximately 1:59 p.m., GUTIERREZ had a text message conversation with LOZANO. During the conversation, GUTIERREZ said to call because "they [BYBEE, VANBUREN, and Person 14] only delivered 14500 [$14,500]."

64.     On or about April 15, 2019, at approximately 2:23 p.m., LOZANO had a conversation with GUTIERREZ on the telephone. During the conversation, LOZANO told GUTIERREZ he would have FRANKLIN deposit the balance via Walmart-to-Walmart money transfer. GUTIERREZ then handed the phone to an unidentified male ("UM") who spoke with LOZANO. LOZANO explained that the couriers did not want to transport all of the money and he planned to send the remaining balance via Walmart-to-Walmart money transfer. The UM indicated he was pleased and stated that LOZANO still needed to deposit $7,500 into the Chase bank account. LOZANO stated that FRANKLIN was working on that.

65.     On or about April 15, 2019, at approximately 5:01 p.m., LOZANO and CARTER had a conversation on the telephone. During the conversation, CARTER asked LOZANO for the CashApp username to which money should be sent. LOZANO provided OROZCO's CashApp username. CARTER stated, "A'right, bet. She [CARTER's female associate] 'bout'a do it [send

18

the money] right now." LOZANO later confirmed that OROZCO received the CashApp money transfer.

66.     On or about April 16, 2019, at approximately 12:24 p.m., LOZANO and the CS had a text message conversation in which they discussed the CS purchasing fentanyl pills. During the conversation, the CS asked how much money LOZANO was charging "for them beans [fentanyl pills]," and indicated the CS wanted to purchase 100 pills.

67.     On or about April 16, 2019, at approximately 12:29 p.m., LOZANO sent a text message to FRANKLIN saying that the CS wanted 100 fentanyl pills the following day.

68.     On or about April 16, 2019, at approximately 3:51 p.m., LOZANO had a conversation with FRANKLIN on the telephone. During the conversation, FRANKLIN said he recruited a woman to deposit $4,000 into the Chase Bank account. LOZANO then directed FRANKLIN to send pictures of any bank receipts to GUTIERREZ.

69.     On or about April 17, 2019, at approximately 3:53 p.m., LOZANO and the CS had a conversation on the telephone. During the conversation, LOZANO stated the CS would be meeting with "LO [FRANKLIN]." LOZANO asked how much money the CS planned to give FRANKLIN. The CS said $1,200. LOZANO provided the CS with a cellular telephone number identified as belonging to "LO [FRANKLIN]."

70.     On or about April 17, 2019, at approximately 6:00 p.m., FRANKLIN and the CS had a conversation on the telephone. During the conversation, FRANKLIN directed the CS to travel to the area of 33** East 106th Street, Cleveland, Ohio, to meet.

71.     On or about April 17, 2019, at approximately 6:43 p.m., in Cleveland, Ohio, FRANKLIN sold the CS 10.92 grams (100 pills) of a mixture of fentanyl and 4-ANPP for $1,200.

72.     On or about April 17, 2019, at approximately 6:40 p.m., LOZANO and FRANKLIN had a conversation on the telephone.  During the conversation, FRANKLIN confirmed he sold 100 "Skittles [fentanyl pills]" to the CS.

73.     On or about April 17, 2019, at approximately 8:17 p.m., after going to the Walmart Money Center at a Walmart in Cleveland, Ohio, FRANKLIN spoke with LOZANO on the telephone.  During the conversation, FRANKLIN reported that he had just sent $3,500 via Walmart-to-Walmart money transfers.  LOZANO said to send photographs of the receipts via WhatsApp to his "peoples in Mexico [GUTIERREZ]."

74.     On or about April 17, 2019, at approximately 10:16 p.m., GUTIERREZ sent LOZANO a text message confirming he received FRANKLIN's pictures of wire transfer receipts.

75.     On or about April 19, 2019, LOZANO and COLEMAN had a text message conversation.  During the conversation, LOZANO said he had been attempting to make contact with FRANKLIN for several days to have FRANKLIN send money to GUTIERREZ and another source of supply.  LOZANO asked that COLEMAN attempt to make contact with FRANKLIN, and COLEMAN agreed to do so.

76.     On or about April 21, 2019, at approximately 12:26 a.m., LOZANO and COLEMAN had a text message conversation.  During the conversation, COLEMAN said he had spoken with FRANKLIN, who reported losing his cellular telephone.  COLEMAN stated, "I can't wait I will take care o[f] everything bra ok. [COLEMAN will take over for FRANKLIN after COLEMAN's release from prison]."

77.     On or about April 22, 2019, at approximately 10:30 p.m., LOZANO and HERNANDEZ had a conversation on the telephone.  During the conversation, LOZANO

explained that an individual he recruited as a driver had entered the United States from Mexico. LOZANO stated that he would begin making arrangements to send money to HERNANDEZ to secure a shipment of drugs, to be driven by the driver from San Diego, California to Cleveland, Ohio.  LOZANO said that the shipment of drugs would contain methamphetamine, heroin, and fentanyl pills.

78.     On or about April 22, 2019, at approximately 10:54 p.m., LOZANO and Person 5, a Mexico-based co-conspirator, had a conversation on the telephone.  During the conversation, Person 5 agreed to supply LOZANO with 1,000 "of the blue ones [fentanyl pills]."  LOZANO also asked Person 5 to "send me a sample of the Chinese [heroin]," and stated, "I really need that 'chinita' [heroin] to be original, from the plant, not the synthetic kind [fentanyl-based]."

79.     On or about April 22, 2019, at approximately 11:55 p.m., LOZANO and Person 6, a Mexico-based co-conspirator, had a conversation on the telephone.  During the conversation, LOZANO attempted to secure a half kilogram of drugs, described by color and other attributes as cocaine.  LOZANO requested Person 6 provide the name of an individual to receive $1,000 via wire transfer.  LOZANO then directed Person 6 to have the drugs delivered to "my brother [HERNANDEZ]."  LOZANO said HERNANDEZ would then give the drugs to "the guy that jumps it [smuggles drugs into the United States from Mexico]."

80.     On or about April 23, 2019, at approximately 11:26 a.m., LOZANO and Person 6 had a text message conversation.  During the conversation, Person 6 sent a name for LOZANO to send money to in order to secure the delivery of the half kilogram of drugs to HERNANDEZ. Person 6 provided LOZANO with the name of an individual in Sonora, Mexico.  LOZANO said he did not want to send the money to this person.  Person 6 then directed LOZANO to send it

[money] to him [Person 6].  Person 6 sent LOZANO a text stating, "[Person 7]..electra [a wire-transfer company] 3rd zone center."

81.    On or about April 23, 2019, at approximately 12:06 p.m., LOZANO and FRANKLIN had a conversation on the telephone.  During the conversation, LOZANO said his "driver" entered the United States from Mexico, and that LOZANO was trying to arrange for the driver to bring "ice and the dog [methamphetamine and heroin]" to Cleveland, Ohio.  FRANKLIN said that he needed "two of them white girls [2 kilograms of cocaine]."  LOZANO responded that he would try to get cocaine the following week.  Later in the call, LOZANO stated he was also going to get "a couple of the pills as well from my peoples over there.  That's my direct line [source of supply]."  LOZANO said that the "dog [heroin]" does not have any "fetty [fentanyl] in it."  Later in the conversation, FRANKLIN explained that business had been slow, and that he still had drugs to sell.

82.    On or about April 23, 2019, at approximately 11:40 p.m., HERNANDEZ sent LOZANO a text message with information to use to wire money for a drug purchase:  "[Person 8] City: TIJUANA   State:  BAJA CALIFORNIA NORTE   MEXICO   Pay."

83.    On or about April 24, 2019, at approximately 11:55 a.m., LOZANO had text message conversations with Person 6 and HERNANDEZ in which LOZANO arranged for an unidentified male ("UM") to deliver to HERNANDEZ the half kilogram of drugs LOZANO previously ordered from Person 6.  Person 6 told LOZANO, "Tell him [HERNANDEZ] to open the door so he [UM] can go into the patio" and leave the drugs.  LOZANO forwarded that message to HERNANDEZ.  HERNANDEZ confirmed he had received the drugs at his residence in Tijuana, Mexico.

84.     On or about April 24, 2019, at approximately 2:26 p.m., LOZANO and
COLEMAN had a text message conversation.  During the conversation, LOZANO explained that
he had been trying to talk to FRANKLIN about sending money to GUTIERREZ.

85.     On or about April 25, 2019, at approximately 12:11 a.m., LOZANO called
FRANKLIN on the telephone.  During the conversation, FRANKLIN told LOZANO that he was
tending to some personal matters and planned to send the wire transfers the following day.
FRANKLIN also said, "Tell my father [COLEMAN] quit talkin that s**t [COLEMAN did not
need to tell FRANKLIN what to do for LOZANO]."

86.     On or about April 25, 2019, at approximately 10:44 p.m., LOZANO called
HERNANDEZ on the telephone.  During the conversation, HERNANDEZ confirmed he
received 120 grams of cocaine at his residence in Tijuana, Mexico.

87.     On or about April 26, 2019, at approximately 10:13 p.m., LOZANO and Person 5
had a conversation on the telephone.  During the conversation, Person 5 asked how strong
LOZANO wanted the "pills [fentanyl pills] to be" on a scale of 1 to 10.  LOZANO requested that
the pills be an 8 or a 9 out of 10, as he did not want any "issues [overdoses]."  Person 5 told
LOZANO that the sample of heroin is "b**ching [good quality]."  Later in the call, LOZANO
said that he would send more money to HERNANDEZ, and that HERNANDEZ and Person 5
could then make arrangements to meet up.

88.     On or about April 26, 2019, beginning at approximately 10:23 p.m., LOZANO
and HERNANDEZ had a text message conversation regarding the money that LOZANO planned
to send.  During the conversation, LOZANO said, "2100 Cotorro, 3500 [Person 5], 600 for the
cross. 6,200 total."  LOZANO confirmed the information for sending money: "MARIO

HERNANDEZ LEON **** ROLL DRIVE # ****** SAN DIEGO, CA. 92154."
HERNANDEZ confirmed.

89.     On or about April 28, 2019, LOZANO and FRANKLIN had a conversation on the telephone.  During the conversation, FRANKLIN confirmed he sent $6,000 through the USPS to the address LOZANO provided in San Diego, California.

90.     On or about April 29, 2019, FRANKLIN, acting LOZANO's direction, caused Person 15 to send to HERNANDEZ in San Diego, California, a parcel ("Money Parcel 1") containing approximately $6,000 in U.S. currency, wrapped in plastic and concealed inside a box for decorative shelves.

91.     On or about April 29, 2019, at approximately 4:25 p.m., FRANKLIN sent LOZANO a series of text messages.  One message contained the USPS tracking number for Money Parcel 1.  FRANKLIN also stated that the parcel would arrive in San Diego, California, by 12:30 p.m. the next day.

92.     On or about April 30, 2019, beginning at approximately 6:59 p.m., LOZANO and HERNANDEZ had a text message conversation.  During the conversation, HERNANDEZ indicated that he was checking the address where FRANKLIN had sent Money Parcel 1, and learned it was being held at a San Diego, California, post office.  LOZANO suggested that HERNANDEZ handle any questioning about Money Parcel 1 as follows:  "If anything say it was sent by your cousin who is illegal and does not have papers and a male co-worker or female co-worker sent it. Works in a restaurant in Cleveland that it is to fix a room in his Tijuana house and give the name of the baby and that's it."

93.     On or about April 30, 2019, at approximately 8:13 p.m., HERNANDEZ and LOZANO had a conversation on the telephone.  During the conversation, HERNANDEZ

indicated that he went to the post office and learned that Money Parcel 1 was being held at a USPS facility in Otay Mesa, California.  HERNANDEZ said he then drove to that USPS facility and found it was closed.  HERNANDEZ said the facility would open at 9:30 a.m., and that he would cross over from Mexico early the following morning to retrieve Money Parcel 1.

94.     On or about May 1, 2019, at approximately 12:37 p.m., LOZANO and HERNANDEZ had a conversation on the telephone.  During the conversation, HERNANDEZ said he had spoken with a U.S. Postal Inspector.  The Inspector asked HERNANDEZ questions about what Money Parcel 1 contained and who sent it.  HERNANDEZ said he told the Inspected the parcel contained $5,000 to $6,000 and was sent to him by a cousin in Ohio, and gave a false story similar to what LOZANO suggested.  HERNANDEZ also said he had consented to USPS opening Money Parcel 1.  LOZANO told HERNANDEZ to give the Inspector LOZANO's telephone number so LOZANO could attempt to get Money Parcel 1 released.

95.     On or about May 1, 2019, at approximately 12:47 p.m., a U.S. Postal Inspector called LOZANO on the telephone.  During the conversation, LOZANO identified himself as "Juan" and provided a false story about the money.  LOZANO said, among other things, that he had sent $6,000 derived from the sale of a vehicle to his cousin in San Diego, California, to be used to repair LOZANO's mother's home.

96.     On or about May 1, 2019, at approximately 1:12 p.m., LOZANO called FRANKLIN on the telephone.  During the conversation, LOZANO told FRANKLIN that U.S. Postal Inspectors said that a K-9 alerted on Money Parcel 1.  FRANKLIN responded by expressing disbelief, and said he had washed the money with soap and water before he concealed it inside the parcel, such that there was no way a K-9 would alert to Money Parcel 1.

97.     On or about May 1, 2019, at approximately 5:42 p.m., LOZANO called HERNANDEZ on the telephone in which LOZANO said that Money Parcel 1 would be at the mailbox in San Diego, California, the following day (referring to a mail box rented at a private shipping facility).

98.     On or about May 1, 2019, at approximately 9:53 p.m., LOZANO and the CS had a conversation on the telephone. During the conversation, LOZANO attempted to recruit the CS to travel to San Diego, California, to ship drugs back to Cleveland, Ohio. LOZANO described the drugs as: "so it's gonna be the, the one, twenty of the, of the, of the girl [120 grams of cocaine]. It's gonna be the five hundred of the boy [500 grams of heroin]. It's gonna be one ice cube [1 pound of crystal methamphetamine], uh, and then, it's gonna be, um, two, I mean, a, a, a thousand of them little, them skittles [1,000 fentanyl pills]."

99.     On or about May 1, 2019, at approximately 10:22 p.m., CARTER and LOZANO had a text message conversation. During the conversation, CARTER said, "Da chic dr said fentanyl was n [in] her systems. [A female customer's doctor told her that tests showed fentanyl in her system from pills LOZANO had provided to CARTER.]" LOZANO said none of his distributors had reported any problems with the pills. CARTER said his distributor "thought they was real [CARTER's associate selling the purported oxycodone pills thought they were true pharmaceutical oxycodone tablets]" and added that his distributor did not want to see anyone get hurt. CARTER reiterated that the pills at issue in the doctor's testing came from LOZANO.

100.    On or about May 1, 2019, at approximately 10:49 p.m., LOZANO and HERNANDEZ had a conversation on the telephone. During the conversation, LOZANO explained that he recruited the CS to travel to San Diego, California to receive the drugs from HERNANDEZ and separate them for mailing. LOZANO stated that one of the parcels should

26

contain "the blue ones and the, the water [fentanyl pills and crystal methamphetamine]," and then the remaining drugs should be divided between two other parcels. LOZANO stated, "Make sure that when, when you get it and everything, afterward you wash it and, and, and you take out all the, the, your, your DNA from that s**t. And put them in a bag and give it to him like that in a bag, like that."

101.    On or about May 2, 2019, beginning at approximately 5:02 p.m., LOZANO sent a series of text messages to COLEMAN while both were still incarcerated. LOZANO stated, "BRO. TALK TO UR SON [FRANKLIN], HE BLOCKED ME FROM BOTH HIS PHONES AND I NEED TO TALK. HE NOT ANSWERING, ITS BEEN 2 DAYS. WHATS UP MAN.. IM NOT USED TO WORKING LIKE THIS. PEOPLE ARE COMING TO TOWN TO PICK UP THE PAPERWORK [money] FOR THE CONTRACTS [drugs] AND I NEED EVERYTHING IN ORDER BUT HE JUST IGNORING ME AND NOW HE BLOCKED ME. HELP ME OUT PLEASE."

102.    On or about May 2, 2019, at approximately 5:16 p.m., LOZANO and HERNANDEZ had a conversation on the telephone. During the conversation, HERNANDEZ asked how much money he should give to Person 5. LOZANO replied, "three five-hundred [$3,500] are his."

103.    On or about May 2, 2019, at approximately 6:09 p.m., LOZANO and HERNANDEZ had a conversation on the telephone. During the conversation, HERNANDEZ explained that he received Money Parcel 1. HERNANDEZ stated that he opened the package and discovered all of the bills were wet, as if they had been "washed."

104.    On or about May 2, 2019, at approximately 11:54 p.m., LOZANO and HERNANDEZ had a conversation on the telephone. During the conversation, HERNANDEZ

said he would receive the fentanyl pills from Person 5. LOZANO asked how much it would cost

to have the drugs smuggled into the United States. HERNANDEZ said he would check with the

driver.

105.    On or about May 3, 2019, at approximately 2:40 p.m., LOZANO and

FRANKLIN had a conversation on the telephone. During the conversation, LOZANO discussed

the prices of kilogram quantities of cocaine he received from GUTIERREZ. LOZANO asked

FRANKLIN how long it would take him to sell "a couple of them [two kilograms of cocaine]" if

they paid $33,000 per kilogram. FRANKLIN said approximately four days. LOZANO asked

how much money FRANKLIN had to pay for fentanyl pills. FRANKLIN responded, "about

10,000." LOZANO stated, "I'm shipping you the dog, some girl, the ice and another thousand of

them new joints [heroin, cocaine, crystal methamphetamine, and 1,000 fentanyl pills]."

LOZANO said that the $6,000 in Money Parcel 1 was being held up at the post office (though it

had been released to HERNANDEZ). LOZANO told FRANKLIN to send an additional $1,000

to HERNANDEZ via Walmart-to-Walmart money transfer to secure the shipment of drugs from

California.

106.    On or about May 3, 2019, at approximately 3:17 p.m., HERNANDEZ called

LOZANO on the telephone. During the conversation, HERNANDEZ said he could not receive

the wire transfer because his identification was expired. It was decided that LOZANO would

send the $1,000 to a shared relative, Person 9.

107.    On or about May 3, 2019, at approximately 3:27 p.m., LOZANO sent a text

message to FRANKLIN directing FRANKLIN to send $1,000 to Person 9 in San Diego,

California, and to use Walmart-to-Walmart money transfer.

108.    On or about May 9, 2019, at approximately 1:12 p.m., LOZANO sent a text message to FRANKLIN that stated:  "[street address] Tolleson AZ. 85353 SEND THE PAPER HERE, 25,000 [Send $25,000 to this address]."

109.    On or about May 10, 2019, at approximately 12:02 p.m., LOZANO called FRANKLIN on the telephone.  During the conversation, LOZANO asked if FRANKLIN would "be able to send that [money] out today."  FRANKLIN replied, "Yeah, a nineteen pack [$19,000]."  FRANKLIN asked, "What you want me to do?"  LOZANO replied, "Just zip it through in the mail," and also said to buy "one of those twenty dollar DVD players and put it inside that box [conceal the money in the DVD player box]."  FRANKLIN said he had "washed the money" and stated, "I washed all that s**t last night. I washed it and cleaned all that s**t off real good."  FRANKLIN also said he would "have the rest" of the $25,000 soon because people owed him certain amounts of money.

110.    On or about May 10, 2019, at approximately 12:06 p.m., LOZANO sent a text message to FRANKLIN again providing the address in Tolleson, Arizona, and asking that the $25,000 be sent "OVERNIGHT" and with "NO SIGNATURE REQUIRED."

111.    On or about May 10, 2019, at approximately 6:52 p.m., LOZANO and HERNANDEZ had a conversation on the telephone.  During the conversation, HERNANDEZ said he delivered the package of narcotics to the delivery driver to be smuggled over the border.

112.    On or about May 10, 2019, at approximately 10:06 p.m., LOZANO contacted a DEA Undercover Agent posing as a co-conspirator recruited by the CS ("UC1") and confirmed that the drugs had crossed the border, and discussed plans for UC1 to meet HERNANDEZ to pick up the drugs.

113.    On or about May 13, 2019, at approximately 1:46 p.m., LOZANO and HERNANDEZ had a conversation on the telephone.  During the conversation, they agreed that HERNANDEZ would meet UC1 not that day but the next day.

114.    On or about May 13, 2019, FRANKLIN caused to be sent to GUTIERREZ in Tolleson, Arizona, a parcel ("Money Parcel 2"), bearing sender information of VANBUREN's name and phone number and an address used by FRANKLIN, and containing $15,920 in U.S. currency concealed inside of a speaker.  The bills were wet and smelled of fabric softener or detergent.

115.    On or about May 13, 2019, at approximately 5:05 p.m., FRANKLIN sent LOZANO a text message with the tracking number for Money Parcel 2.

116.    On or about May 13, 2019, at approximately 5:08 p.m., LOZANO sent GUTIERREZ a text message with the tracking number for Money Parcel 2.

117.    On or about May 13, 2019, at approximately 10:51 p.m., LOZANO and HERNANDEZ had a conversation on the telephone.  During the conversation, LOZANO said UC1 arrived in San Diego and the meeting was scheduled for the following afternoon. HERNANDEZ said he had packaged the drugs inside of a computer modem box.

118.    On or about May 14, 2019, beginning at approximately 10:00 a.m., LOZANO and UC1 had a series of telephone and text-message conversations.  During those conversations, they decided that UC1 would pick up the drug package at a shopping center in Chula Vista, California.

119.    On or about May 14, 2019, at approximately 11:13 a.m., HERNANDEZ and Person 10, entered the United States from Mexico through the Otay Mesa Port of Entry. HERNANDEZ was driving a silver Honda sedan with Mexican license plates.

120.    On or about May 14, 2019, at approximately 2:00 p.m., in the parking lot of a shopping center in Chula Vista, California, HERNANDEZ exited the front driver's side of the silver Honda sedan and entered the front passenger's side of UC1's vehicle.  While inside the vehicle, HERNANDEZ handed UC1 a shopping bag that contained a computer modem box (the "Mixed Narcotics Parcel"), which contained a receipt for an on-line purchase in HERNANDEZ's name and the following controlled substances: approximately 1,001 blue pharmaceutical tablets coded "M 30" (oxycodone), but which in fact contained heroin and fentanyl and weighed 139.27 grams; 5 blue pharmaceutical tablets coded "V 48 12" (oxycodone), but which in fact contained heroin, fentanyl, and 4-ANPP, and weighed 0.65 grams; 5 blue pharmaceutical tablets coded "V 48 12" (oxycodone), but which in fact contained heroin and fentanyl and weighed 0.64 grams; 483.84 grams of a mixture of fentanyl, butyrylfentanyl, and 4-ANPP; 108.54 grams of cocaine; 2.83 grams of heroin; and 430.4 grams of crystal methamphetamine that was approximately 100% pure methamphetamine hydrochloride.  HERNANDEZ gave the Mixed Narcotics Parcel to UC1 so that UC1 would mail the Mixed Narcotics Parcel to the Northern District of Ohio for distribution of the drugs it contained.

121.    On or about May 20, 2019, LOZANO and GUTIERREZ had a text message conversation.  During the conversation, GUTIERREZ said, "Send me the address so I can send you the pills [fentanyl pills]."

122.    On or about May 21, 2019, at approximately 9:01 a.m., VANBUREN call a U.S. Postal Inspector on the telephone.  During the conversation, the Inspector said that VANBUREN should come to the USPS facility to discuss Money Parcel 2, and VANBUREN agreed.

123.    On or about May 21, 2019, at approximately 9:03 a.m., FRANKLIN called LOZANO on the telephone. During the conversation, they discussed how they should have VANBUREN handle discussing Money Parcel 2 with the U.S. Postal Inspector, and concerns about why the Inspector would report that the delivery address in Arizona was not valid. FRANKLIN said, "I told him [VANBUREN] to say he was going to buy a f**king car because" VANBUREN had recently returned from Arizona. FRANKLIN explained, "That's why I did it because he got a job. So I'm gonna tell him to do that and see how it go from there." LOZANO agreed with that plan. FRANKLIN expressed concern about whether VANBUREN could "get in trouble" and said, "I'm gonna have him play like he don't know." LOZANO agreed with that plan, but explained there were four reasons to be concerned about the Inspector questioning VANBUREN about Money Parcel 2: ,"So one is, we are sending more than the $10,000 allowed; two, we are sending it hidden; three, we are sending it to a person that doesn't exits; and four, we are sending it to an address that doesn't exist."

124.    On or about May 21, 2019, LOZANO and FRANKLIN had a conversation on the telephone. During the conversation, LOZANO said, "I need an address because they gonna send more of them Skittles [fentanyl pills]." Later in the conversation, FRANKLIN said, "We ain't never did the 33** [33** East 106th Street, Cleveland, Ohio]. We can do that one."

125.    In or around May 2019, GUTIERREZ caused to be sent from Glendale, Arizona, to FRANKLIN in Cleveland, Ohio a parcel ("Fentanyl Pill Parcel 2") addressed to 33** East 106th Street, Cleveland, Ohio, and containing approximately 4,747 pharmaceutical tablets coded "M 30" (oxycodone), but which in fact contained fentanyl and 4-ANPP, and weighed approximately 519.09 grams, concealed inside a plastic bucket.

126.    On or about May 24, 2019, at approximately 5:30 p.m., LOZANO and

GUTIERREZ had a conversation on the telephone.  During the conversation, GUTIERREZ said

Fentanyl Pill Parcel 2 should arrive in the next several days.  GUTIERREZ indicated that he sent

"the same amount as always [approximately 5,000]."

127.    On or about May 24, 2019, at approximately 6:44 p.m., GUTIERREZ sent

LOZANO a text message with the tracking number for Fentanyl Pill Parcel 2.

128.    On or about May 28, 2019, at approximately 11:25 a.m., FRANKLIN called

VANBUREN on the telephone while VANBUREN was approaching FRANKLIN's residence.

During the conversation, they discussed where VANBUREN had stashed FRANKLIN's drugs.

FRANKLIN asked, "You got my dope?"  VANBUREN replied, "Yeah anything that came in the

box."  They then discussed the location of FRANKLIN's money.   FRANKLIN explained that

"The bag [drugs] gone, dude."  VANBUREN asked, "The dog [heroin]?"  Later in the

conversation, FRANKLIN tried to clarify the subject, "Well, you said the dope got ripped," and

asked where "the dope" was.  VANBUREN directed FRANKLIN to the "kitchen cabinet" before

informing FRANKLIN that he had arrived to the house and asking FRANKLIN to "unlock the

door."

129.    On or about June 2, 2019, LOZANO and GUTIERREZ had a text message

conversation.  During the conversation, GUTIERREZ said, "they're going to pick up the pills

that you have there [GUTIERREZ's associate would pick up unsold fentanyl pills]."  LOZANO

replied, "Ok. Let me know so I can give you the address. Hopefully the other ones arrive

tomorrow."

130.    On or about June 3, 2019, LOZANO sent GUTIERREZ text messages with one of

FRANKLIN's telephone numbers and stating, "Call him [FRANKLIN] he's already there."

131.    On or about June 4, 2019, at approximate 11:35am and 2:32p.m., GARCIA attempted to call FRANKLIN using the telephone number that LOZANO had provided GUTIERREZ.

132.    On or about June 4, 2019, at approximately 4:20 p.m., LOZANO and GUTIERREZ had a text message conversation.  During the conversation, GUTIERREZ said that no one was answering the number LOZANO had provided.  Later in the conversation, GUTIERREZ reiterated that no one was answering the number that LOZANO had provided the day before, and said, "tell them to answer because these guys [GARCIA and an associate] are on their way over there already and they [FRANKLIN] don't answer so they [GARCIA and an associate] can pick up the pills [fentanyl pills]."  LOZANO then provided GUTIERREZ three telephone numbers for FRANKLIN, including the one he had already provided.

133.    On or about June 4, 2019, at approximately 4:27 p.m., GARCIA sent FRANKLIN a text message that stated, "If you have a chance buddy, call me. I was told to call you."

134.    On or about June 4, 2019, at approximately 4:27 p.m., GARCIA called FRANKLIN on the telephone.  During the conversation, GARCIA said, "My, my friend, yeah, give me this number, because, I, I, I need to pick it up, some pills [fentanyl pills]."  FRANKLIN responded, "I ain't got no pills [fentanyl pills].  I just got the money.  I ain't got no pills."  GARCIA clarified that FRANKLIN had "the money."  FRANKLIN affirmed and reiterated that he had no pills.  GARCIA said, "Oh, let me call him then."

135.    On or about June 5, 2019, LOZANO attempted to conceal the contraband cellular telephone he had been using to communicate with his co-conspirators as correctional officers at NEOCC entered his prison cell to search for contraband.

136.    On or about June 12, 2019, at approximately 12:19 p.m., FRANKLIN called PINNOCK on the telephone.  During the conversation, FRANKLIN said, "Bring me one of them [drugs]" and indicated PINNOCK knew where he was, referring to FRANKLIN's residence in Cleveland, Ohio.  FRANKLIN stated, "It will be gone by the end of the day [the drugs will be sold].  Come on."

137.    On or about June 12, 2019, at approximately 1:44 p.m., PINNOCK arrived at FRANKLIN's residence in a blue Honda sedan, and entered the residence to deliver FRANKLIN drugs.

138.    On or about June 12, 2019, at approximately 2:43 p.m., PINNOCK exited FRANKLIN's residence, entered the blue Honda sedan and drove away in possession of 0.95 grams of a mixture of carfentanil and cocaine, concealed in the glove box of the vehicle.

139.    On or about June 12, 2019, at approximately 11:43 p.m., GARCIA departed Rockford, Illinois, by car and drove to the Cleveland, Ohio area.

140.    On or about June 13, 2019, at approximately 10:34 a.m., GARCIA arrived to the Cleveland, Ohio area, and then drove from the Cleveland, Ohio area to Orville, Ohio.

141.    On or about June 14, 2019, at approximately 9:00 p.m., GARCIA departed Orville, Ohio by car and drove to the Cleveland, Ohio area, and then on to Calumet City, Illinois.

142.    On or about June 15, 2019, at approximately 10:57 a.m., GARCIA and Person 16 departed Calumet City, Illinois by car and drove towards Ohio.

143.    On or about June 15, 2019, at approximately 2:57 p.m., on the Ohio Turnpike in the Toledo, Ohio area, GARCIA and Person 16 encountered law enforcement in a traffic stop, and then left the Turnpike and drove on local roads from the Toledo, Ohio area to the Cleveland, Ohio area.

35

144.    On or about June 16, 2019, at approximately 7:15 p.m., FRANKLIN called an unidentified female ("UF") on the telephone.  During the conversation, the UF, who was expecting to meet FRANKLIN for a meal, expressed confusion that FRANKLIN was "so eager to be on Union [at his residence near the intersection of East 105th Street and Union Avenue, in Cleveland, Ohio]."  The UF said, "I really wanna know what be going on over there." FRANKLIN responded, "I sell drugs out there on Union.  I sell drugs.  I make my money on Union.  That's [what] I do on Union."  FRANKLIN later continued, "I sell mother f**kin' drugs! I've been selling drugs since 1992!  I've been [at] the same mother f**kin' spot since 1992! [FRANKLIN has been selling drugs from his residence since 1992.]"

145.    On or about June 18, 2019, at approximately 8:49 a.m., FRANKLIN and an unidentified male had a conversation on the telephone.  During the conversation, the UM indicated that he planned to "come see" FRANKLIN "in a little bit [to purchase an unknown quantity of drugs]."  The UM asked FRANKLIN about the quality and FRANKLIN replied, "You seen what I did.  I don't do s**t to it.  S**t, come up with some money, you can take all this s**t.  So I can pay them and keep it moving [obtain more drugs from his source of supply]."

146.    On or about June 18, 2019, at approximately 10:00 a.m., at FRANKLIN's residence in Cleveland, Ohio, FRANKLIN sold EVANS approximately 20.02 grams of carefentanil.

147.    On or about June 18, 2019, at approximately 10:07 a.m., in a grey Hyundai sedan in Cleveland, Ohio, EVANS possessed on his person approximately 20.02 grams of carefentanil.

148.    On or about June 19, 2019, at approximately 11:48 p.m., FRANKLIN and BYBEE had a conversation on the telephone immediately after law enforcement vehicles had pulled up to the area of FRANKLIN's residence.  During the conversation, FRANKLIN asked,

36

"If I flushed something [flushed drugs down the toilet], how do I get it out?"  BYBEE attempted to confirm what FRANKLIN was talking about.  FRANKLIN said, "If I flushed something, how I get it out man?  Down the toilet man."  BYBEE said he would have to take the "trap" out.  FRANKLIN said there was no trap on his plumbing.  BYBEE responded, "Then it's gone," but added that FRANKLIN "might be able to bust it out of the floor," and asked if FRANKLIN had a camera to see the inside of pipes.  FRANKLIN confirmed that he did, and they discussed BYBEE coming over to assist him.

149.     On or about July 8, 2019, ARGUELLES and Luisa Margarita Sapiens Villa (charged separately) had a text message conversation.  During the conversation, ARGUELLES told Sapiens Villa that the people for whom she worked, referencing GUTIERREZ and his associates, wanted Sapiens Villa to go to Albuquerque, New Mexico, the next day.  Sapiens Villa agreed.

150.     On or about July 9, 2019, the CS called GUTIERREZ on the telephone.  During the conversation, GUTIERREZ agreed to sell the CS approximately 5,000 fentanyl pills, to be delivered to the CS in Cleveland, Ohio.  GUTIERREZ stated, "They are on the way.  They crossed the river [Mexican border] and should be there tomorrow.  The lady [courier] will arrive up there tomorrow."

151.     On or about July 9, 2019, at approximately 11:42 a.m., Sapiens Villa and ARGUELLES had a text message conversation.  During the conversation, Sapiens Villa said she had arrived to Albuquerque.  ARGUELLES provided Sapiens Villa with a telephone number and instructed Sapiens Villa, "Ask for El Muñeko [the Doll] on behalf of El Uno [Number One]."

152.     On or about July 9, at approximately 4:42 p.m., Sapiens Villa and ARGUELLES had a text message conversation.  During the conversation, ARGUELLES asked, "How did the

37

job [procuring fentanyl tablets to transport to Cleveland, Ohio] come out?" Sapiens Villa replied

everything was OK and said she was "at the station [Greyhound Bus Station]."

153.    On or about July 11, 2019, GUTIERREZ and the CS had a series of conversations

via text message and telephone.  During the conversations, they discussed the timing of the

courier's arrival, and the CS provided GUTIERREZ with the telephone number of a DEA

undercover officer ("UC2") who was posing as a co-conspirator who would receive the fentanyl

pills.  Later in the conversations, GUTIERREZ said the courier's vehicle had broken down, and

the courier would contact UC2 when the courier arrived in Cleveland, Ohio.

154.    On or about July 11, 2019, at approximately 5:09 p.m., Sapiens Villa and

ARGUELLES had a conversation via text messages and voice notes.  During the conversation,

Sapiens Villa complained about the difficulty of the journey and said, "Tell your boss to treat me

right [pay well] because I'm really tired."  Sapiens Villa requested the number for the Cleveland

contact.  Later in the conversation, ARGUELLES provided the number for UC2 and stated, "on

behalf of sevoya [GUTIERREZ]."

155.    On or about July 11, 2019, at approximately 9:49 p.m., Sapiens Villa contacted

UC2 and said she was at the Greyhound Bus station in Cleveland, Ohio.  UC2 requested to move

their meeting to the following day, due to the late hour.

156.    On or about July 11, 2019, at approximately 9:57 p.m., GUTIERREZ called the

CS on the telephone.  During the conversation, GUTIERREZ said the meeting had to occur that

night because the courier needed to return home and did not have money to secure a hotel room.

157.    On or about July 11, 2019, at approximately 10:18 p.m., Sapiens Villa and

ARGUELLES had a conversation via text messages and voice notes.  During the conversation,

Sapiens Villa asked, "are they [UC2 and the CS] coming for the girls [fentanyl pills], or what?"

158.    On or about July 11, 2019, at approximately 11:21 p.m., at the Greyhound bus station in Cleveland, Ohio, Sapiens Villa possessed a pillow concealing 6,045 pharmaceutical tablets coded "M 30" (oxycodone), but which in fact contained fentanyl and 4-ANPP, and weighed 663.37 grams.

159.    On or about July 20, 2019, GUTIERREZ and the CS had a series of conversations via text message and telephone in which they discussed GUTIERREZ sending another shipment of fentanyl pills as replacement for the pills that had been seized from Sapiens Villa.  The CS agreed to pay $5,000 toward the purchase of the pills.

160.    On or about July 26, 2019, GUTIERREZ had a telephone conversation with the CS.  GUTIERREZ said there were 5,000 fentanyl pills in Chicago, Illinois, that were ready to go, and asked if the CS had the $5,000.

161.    On or about July 27, 2019, GUTIERREZ and the CS had a conversation on the telephone in which GUTIERREZ stated that he had 20,000 of fentanyl pills in Chicago, but could not find a courier to bring them.

162.    On or about July 29, 2019, GUTIERREZ and the CS had a conversation on the telephone.  During the conversation, they agreed that the CS would send an associate (a DEA undercover officer ("UC3") posing as a co-conspirator) to Chicago to retrieve the pills.

163.    On or about July 30, 2019, GUTIERREZ and the CS had a conversation on the telephone.  During the conversation, GUTIERREZ said the CS would receive at least 2,000 fentanyl pills, but GUTIERREZ would attempt to increase the amount to 5,000.  GUTIERREZ said that he wanted his "connect" to have the impression that the CS could distribute large quantities.

164.    On or about July 31, 2019, at approximately 8:51 p.m., the CS sent a text message to GUTIERREZ with UC3's telephone number.

165.    On or about July 31, 2019, at approximately 10:42 p.m. Central Daylight Time ("CDT"), REYES called UC3 on the telephone.  During the conversation, REYES said that he was calling UC3 on behalf of Person 12.  UC3 confirmed he would arrive in Chicago, Illinois the following day.  REYES said he would provide UC3 an address once UC3 arrived.

166.    On or about August 1, 2019, starting at approximately 10:05 a.m. CDT, REYES and UC3 had a series of conversations via text message and telephone.  During the conversations, REYES sent a text message with an address in Harvey, Illinois, and agreed the meeting would occur there at approximately 12:30 p.m. CDT.  Later in the conversations, REYES described the meeting location.

167.    On or about August 1, 2019, at approximately 12:59 p.m. CDT, GUTIERREZ and the CS.  GUTIERREZ asked if UC3 met with REYES.  The CS replied that the meeting had been scheduled and would occur soon.  GUTIERREZ instructed the CS to call GUTIERREZ after the transaction was complete to confirm that UC3 obtained the fentanyl pills.

168.    On or about August 1, 2019, at approximately 1:25 p.m. CDT, at the meeting location in the parking lot of Dunkin Donuts in Harvey, Illinois, REYES exited his vehicle and entered UC3's vehicle.  REYES handed UC3 a package containing 3,452 pharmaceutical tablets coded "M-30" (oxycodone), but which in fact contained heroin and which weighed approximately 363.32 grams.  UC3 handed $5,000 in U.S. currency to REYES.  REYES then exited UC3's vehicle, entered his vehicle, and departed the area.

All in violation of Title 21, United States Code, Section 846.

## COUNT 2
(Money Laundering Conspiracy, 18 U.S.C. § 1956(h))

The Grand Jury further charges:

169.    From in or around October 2018, to on or about September 12, 2019, the exact

dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and

elsewhere, Defendants JOSE BERNARDO LOZANO-LEON, MARIO KARIM HERNANDEZ-

LEON, CLEMENTE GUTIERREZ-MERAZ, LORNE FRANKLIN, BELEN OROZCO-

SIGALA, DAMON BYBEE, and MONTEZ VANBUREN did knowingly combine, conspire,

and agree with each other and with other persons known and unknown to the Grand Jury to

commit offenses against the United States in violation of Title 18, United States Code, Section

1956, to wit:  knowingly conduct and attempt to conduct financial transactions affecting

interstate and foreign commerce, which involved the proceeds of a specified unlawful activity,

that is, distribution of controlled substances in violation of Title 21, United States Code, Section

841(a)(1), knowing that the transactions were designed in whole and in part to conceal and

disguise, the nature, source, ownership, and control of the proceeds of said specified unlawful

activity and that while conducting and attempting to conduct such financial transactions knew

that the property involved in the financial transactions represented the proceeds of some form of

unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 3
(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1)
and (b)(1)(C), and 18 U.S.C. § 2)

The Grand Jury further charges:

170.    On or about April 17, 2019, in the Northern District of Ohio, Eastern Division,

Defendants JOSE BERNARDO LOZANO-LEON and LORNE FRANKLIN did knowingly and

intentionally distribute approximately 10.92 grams of a mixture and substance containing a

detectable amount of fentanyl, a Schedule II controlled substance, and 4-ANPP, a Schedule II

controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and

(b)(1)(C), and Title 18, United States Code, Section 2.

COUNT 4

(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1)
and (b)(1)(A), and 18 U.S.C. § 2)

The Grand Jury further charges:

171.    The allegations contained in paragraphs 1 and 2 of this Second Superseding

Indictment are incorporated by reference as if stated fully herein.

172.    On or about May 27, 2019, in the Northern District of Ohio, Eastern Division, and

elsewhere, Defendants JOSE BERNARDO LOZANO-LEON, CLEMENTE GUTIERREZ-

MERAZ, and LORNE FRANKLIN did knowingly and intentionally distribute approximately

519.09 grams of a mixture and substance containing a detectable amount of fentanyl, a Schedule

II controlled substance, and 4-ANPP, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1) and (b)(1)(A), and Title 18, United States Code,

Section 2.

COUNT 5

(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

173.    On or about June 12, 2019, in the Northern District of Ohio, Eastern Division,

Defendant TROY PINNOCK did knowingly and intentionally possess with intent to distribute a

detectable amount of a fentanyl analogue (carfentanil), a Schedule I controlled substance, and

42

cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

<u>COUNT 6</u>
(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1)
and (b)(1)(B))

The Grand Jury further charges:

174.    The allegations contained in paragraph 2 of this Second Superseding Indictment are incorporated by reference as if stated fully herein.

175.    On or about June 18, 2019, in the Northern District of Ohio, Eastern Division, Defendant LORNE FRANKLIN did knowingly and intentionally distribute approximately 20.02 grams of a mixture and substance containing a detectable amount of a fentanyl analogue (carfentanil), a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

<u>COUNT 7</u>
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(B))

The Grand Jury further charges:

176.    On or about June 18, 2019, in the Northern District of Ohio, Eastern Division, Defendant NAJEE AMIR EVANS did knowingly and intentionally possess with intent to distribute approximately 20.02 grams of a mixture and substance containing a detectable amount of a fentanyl analogue (carfentanil), a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

## COUNT 8
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2)

The Grand Jury further charges:

177.    On or about July 11, 2019, in the Northern District of Ohio, Eastern Division, and

elsewhere, Defendants CLEMENTE GUTIERREZ-MERAZ and LUCIA ISELA ARGUELLES

did knowingly and intentionally possess with intent to distribute approximately 663.37 grams of

a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled

substance, and 4-ANPP, a Schedule II controlled substance, in violation of Title 21, United

States Code, Sections 841(a)(1) and (b)(1)(A), and Title 18, United States Code, Section 2.

## COUNTS 9 – 21
(Use of a Communication Facility to Facilitate a Drug Felony, 21 U.S.C. § 843(b))

The Grand Jury further charges:

178.    On or about the dates and approximate times listed below, in the Northern District

of Ohio, Eastern Division, and elsewhere, those Defendants listed below did knowingly and

intentionally use a communication facility, to wit:  a telephone, to facilitate acts constituting a

felony under Title 21, United Stated Code, Sections 841(a)(1) and 846:

| Count | Defendants | Date | Time |
|-------|-----------|------|------|
| 9 | JOSE BERNARDO LOZANO-LEON<br>BELEN OROZCO-SIGALA | April 9, 2019 | 9:15 p.m. |
| 10 | JOSE BERNARDO LOZANO-LEON<br>BELEN OROZCO-SIGALA | April 10, 2019 | 7:44 p.m. |
| 11 | JOSE BERNARDO LOZANO-LEON<br>LEEVERN COLEMAN | April 21, 2019 | 12:26 a.m. |
| 12 | JOSE BERNARDO LOZANO-LEON<br>MARIO KARIM HERNANDEZ-LEON | May 1, 2019 | 10:49 p.m. |
| 13 | JOSE BERNARDO LOZANO-LEON<br>CLEMENTE GUTIERREZ-MERAZ | May 24, 2019 | 5:30 p.m. |
| 14 | LORNE FRANKLIN<br>MONTEZ VANBUREN | May 28, 2019 | 11:25 a.m. |
| 15 | LORNE FRANKLIN<br>TROY PINNOCK | June 12, 2019 | 12:19 p.m. |

| 16 | LORNE FRANKLIN<br>DAMON BYBEE | June 19, 2019 | 11:48 p.m. |
| 17 | CLEMENTE GUTIERREZ-MERAZ | July 11, 2019 | 9:57 p.m. |
| 18 | JOSE BERNARDO LOZANO-LEON<br>MARK CARTER | May 1, 2019 | 10:22 p.m. |
| 19 | OSCAR FABIAN GARCIA-REYES<br>LORNE FRANKLIN | June 4, 2019 | 4:27 p.m. |
| 20 | LUCIA ISELA ARGUELLES | July 11, 2019 | 5:09 p.m. |
| 21 | JOSE FRANCISCO REYES | August 1, 2019 | 10:05 a.m. |

All in violation of Title 21, United Stated Code, Section 843(b).

## FORFEITURE

The Grand Jury further charges:

179.    For the purpose of alleging forfeiture pursuant to Title 21, United States Code, Section 853 (drug offenses), and Title 18, United States Code, Section 982(a)(1) (money laundering offense), the allegations of Counts 1 through 8, inclusive, are hereby re-alleged and incorporated herein by reference.  As a result of the foregoing offenses, Defendants JOSE BERNARDO LOZANO-LEON, MARIO KARIM HERNANDEZ-LEON, CLEMENTE GUTIERREZ-MERAZ, LORNE FRANKLIN, LEEVERN COLEMAN, BELEN OROZCO-SIGALA, NAJEE AMIR EVANS, TROY PINNOCK, DAMON BYBEE, MONTEZ VANBUREN, MARK CARTER, LUCIA ISELA ARGUELLES, OSCAR FABIAN GARCIA-REYES, and JOSE FRANCISCO REYES shall forfeit to the United States:  any and all property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as the result of the drug offenses; any and all of the defendants' property used or intended to be used, in any manner or part, to commit or to facilitate the commission of the drug offenses; and, all

property, real and personal, involved in the money laundering offense, and all property traceable to such property; including, but not limited to, the following:

$15,920.00 in U.S. Currency seized on or about May 15, 2019, and concealed in Money Parcel 2.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.